### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**OWEN GARTH HINKSON**                                          **PLAINTIFF**
**Reg. #17785-038**

**v.**                              **No: 4:18-cv-00749 KGB-PSH**

**DAVID RAHBANY,** *et al.*                                      **DEFENDANTS**

### PROPOSED FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following Recommendation has been sent to United States District Judge Kristine G. Baker.   You may file written objections to all or part of this Recommendation.  If you do so, those objections must:  (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

### I.  Introduction

Plaintiff Owen Garth Hinkson ("Hinkson") filed a *pro se* complaint on October 9, 2018, raising claims under the Federal Tort Claims Act ("FTCA") and naming the United States of America, the Department of Justice, and John Doe as defendants (Doc. No. 2).  The Department of Justice and United States of America

have been dismissed as defendants.  *See* Doc. Nos. 56 & 87.  Hinkson was granted

permission to amend his complaint to replace his FTCA claims with *Bivens*[1] claims

against defendants David Rahbany and Daniel Gough (the "Defendants").  *See* Doc.

Nos. 56 & 68.  Junius B. Cross Jr. was appointed to represent Hinkson in all respects,

specifically including the identification of any other defendants.  *See* Doc. Nos. 94

& 97.

Hinkson claims that he sustained injuries after falling off a fixed stool while

restrained in the U.S. Marshal Service (USMS) cellblock space in the federal

courthouse in Little Rock, Arkansas, on April 6, 2017.  Doc. No. 57.  He alleges that

Defendants Rahbany and Gough were aware that another inmate had fallen off the

stool in October of 2016 and were therefore deliberately indifferent to a substantial

risk of harm by failing to warn Hinkson of the danger.  *Id.* Hinkson also alleges that

Rahbany failed to properly supervise and train Gough.  *Id.*

The Defendants move for judgment on the pleadings, and in the alternative,

for summary judgment.  Doc. Nos. 98-99.  They argue that they were not deliberately

indifferent to any risk of harm associated with the stool, and that in any case, a

---

[1] *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388
(1971) ("*Bivens*") holds that federal prisoners may bring certain civil rights lawsuits for
damages against federal officials.  "An action under *Bivens* is almost identical to an
action under section 1983, except that the former is maintained against federal officials
while the latter is against state officials."  *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th
Cir. 1999).

*Bivens* remedy should not be extended to Hinkson's claims.    Hinkson filed responsive pleadings (Doc. Nos. 100-102), and the Defendants filed a reply (Doc. No. 105).    After reviewing these pleadings, the Court informed the parties that it intends to treat Defendants' motion as one for summary judgment and consider the evidence submitted by the Defendants.    At the Court's direction, the parties filed statements of undisputed and disputed facts (Doc. Nos. 110 & 111).    The statements of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute, and Defendants are entitled to judgment as a matter of law.

## II. Legal Standards

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Id.* (citations

omitted).  An assertion that a fact cannot be disputed or is genuinely disputed must

be supported by materials in the record such as "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or

other materials . . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact

is disputed or undisputed by "showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  A dispute is

genuine if the evidence is such that it could cause a reasonable jury to return a verdict

for either party; a fact is material if its resolution affects the outcome of the case.

*Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012).  Disputes

that are not genuine or that are about facts that are not material will not preclude

summary judgment.  *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th

Cir. 2010).

### III.  Hinkson's Complaint Allegations

Hinkson alleges that the day before the incident in question, he was

transported from the Lonoke County jail to a Correction Corporation of America

(CCA) facility in Tennessee.  Doc. No. 57 at 9.  CCA then transported Hinkson to

the United States District Court in Little Rock, Arkansas on April 6, 2017, for an

initial appearance before U.S. Magistrate Judge Beth Deere.  *Id.*  Before the hearing,

a Deputy U.S. Marshal (DUSM) walked Hinkson to an attorney interview room located in the USMS office to confer with his court appointed counsel. *Id.* The stool in the interview room where Hinkson was seated was bolted to the floor. *Id.* at 3. Hinkson was fully restrained, which included leg restraints. *Id.* at 9. He alleges that when the meeting with counsel ended, he stood up and stepped back. *Id.* When he did so, the leg restraints on the floor in front of his seat caught on the stool and he fell backwards, striking and causing injury to his head, shoulders, and right hip. *Id.*

Hinkson alleges that after the accident, he was taken to another location in the USMS office where he received medical attention. *Id.* at 10-11. His eyes were examined and he was asked a series of questions to see if he responded coherently. *Id.* Hinkson claims he was unable to respond coherently. *Id.* at 11. He was then asked if he wanted to attend Court, and when he said he did, he was taken to the courtroom without leg restraints. *Id.*

Hinkson claims that because of the way the "seat is set" in the attorney interview room and because another inmate had fallen off the seat in October 2016, the Defendants should have removed his leg restraints while he was seated there, and their failure to do so constituted deliberate indifference. *Id.* at 11-13. He seeks money damages for the injuries he sustained. *Id.* at 12-13.

### IV.  Evidence Provided by Defendants

In support of their motion for summary judgment, the Defendants submitted declarations from David Rahbany,[2] Daniel Gough,[3] and Jay L. Tuck,[4] incident reports and other documentary evidence related to Hinkson's April 6, 2017 fall, and certain USMS policies.  *See* Doc. Nos. 99-1 – 99-5; 110-1 – 110-11.   These documents establish the following undisputed facts.

The main cellblock, interview rooms, and USMS office are located on the second floor of the Little Rock federal courthouse.  Doc. No. 99-1 at 2 (*Declaration of David Rahbany*).  Construction of this space was completed in 2009.  Doc. No. 99-3 at 3-4 (*Declaration of Jay L. Tuck*, ¶4).  From that time to the date of the incident in question, there were no major renovations or changes to the cellblock and interview rooms. *Id.;* Doc. No. 99-4 at 1 (*Supplemental Declaration of Jay L. Tuck,* ¶ 2).  There are four interview rooms, each with one metal stool in the prisoner space, and a fifth larger interview room with two stools.  Doc. No. 99-4 at 1 (*Supplemental Tuck Declaration,* ¶2).  All of the stools are identical; they are bolted to the floor and do not tilt or rotate in any direction.  Doc. No. 99-3 at 2-3 (*Tuck Declaration,* ¶4). The attorney space and prisoner space are separated by a fine mesh screen.  Doc.

---

[2] Rahbany was the Chief Deputy U.S. Marshal in the Eastern District of Arkansas at the time of Hinkson's fall.

[3] Gough was a Deputy U.S. Marshal in the Eastern District of Arkansas at the time of Hinkson's fall.

[4] Tuck is Chief Deputy U.S. Marshal in the Eastern District of Arkansas.

No. 99-4 at 1 (*Supplemental Tuck Declaration,* ¶2). There are no security cameras in the interview rooms because video recording is prohibited. Doc. No. 99-1 at 2 (*Rahbany Declaration*). According to Rahbany, the security cameras in the cellblock area would not have shown Hinkson's fall. *Id.*

USMS policy requires that prisoners who are moved from the cellblock to a courtroom, or in any short move within the courthouse, either be "fully restrained" (*i.e.*, handcuffed in front while wearing leg irons) or handcuffed behind the back. Doc. No. 99-3 at 3 (*Tuck Declaration,* ¶5). The longstanding practice of USMS in the Eastern District of Arkansas for prisoner movements within the courthouse is to fully restrain the prisoner, that is, with handcuffs in the front and leg restraints. Doc. No. 99-3 at 3 (*Tuck Declaration,* ¶5); Doc. No. 99-3 at 13-14 (*USMS Policy 9.18(E)(3)*). Prisoners who have been brought into the federal courthouse from a detention facility, as was the case with Hinkson, wear leg shackles at all times in the courthouse, unless they are in a courtroom for a jury trial. Doc. No. 99-3 at 3 (*Tuck Declaration,* ¶ 5).

In early April of 2017, Hinkson was arrested in Lonoke County, Arkansas on a federal warrant originating in the Northern District of Georgia. Hinkson was taken into federal custody and transported to the West Tennessee Detention Facility, Mason, Tennessee, which is owned and operated by CCA (now known as Core Civic), a private contractor that had a contract with USMS. Doc. No. 99-3 at 1-2

(*Tuck Declaration, ¶2*).  Hinkson's initial appearance before a judicial officer was scheduled for April 6, 2017, at 1:30 p.m. before Magistrate Judge Deere.  Doc. No. 99-3 at p. 27 (*Notice of Hearing*).

On April 6, 2017, CCA guards transported Hinkson to the United States District Courthouse in Little Rock.  Doc. No. 99-3 at 2 (*Tuck Declaration, ¶ 3*).  In addition to CDUSM Rahbany, the following USMS personnel, with their race and gender indicated, were on duty at the courthouse that day:  Regan Stephens (wm), Phillip Peckham (wm), Brian Sipes (wm), Daniel Gough (wm), Ashley Draper (wf), Brent Troyer (wm), and contract guard Kaleisha Wise (bf) (not a USMS employee).  Doc. No. 110-11 (*4/6/2017 Staffing Assignments*). Gough's assignments that day were deputy in charge (DIC) of the cellblock and plea and arraignment (P&A).  *Id.*

At 1:15 pm, Deputy U.S. Marshal (DUSM) Brent Troyer was informed that Hinkson had fallen in interview room number one and was bleeding from the head.  Doc. No. 99-3 at 7 (*Field Report*).  Troyer reported that upon arrival at the interview room, he found Hinkson sitting on the interview room stool holding his head, with a small amount of blood coming from the back of his head.  *Id.*  Hinkson said that he had attempted to stand up, his leg chains were wrapped around the stool, and he fell backwards, hitting his head on the wall behind him.  *Id.*  According to Troyer, Hinkson was able to tell Troyer his name, what day it was, and where he was.  *Id.* Troyer reported that Hinkson was allowed to clean up and a band aid was placed on

the back of his head. *Id.* Hinkson signed a medical treatment waiver and said he would wait to be treated when he was returned to the CCA detention facility. *Id.*; Doc. No. 99-3 at 8 (*Waiver of Medical Treatment*).

At the hearing before Magistrate Judge Deere, Hinkson waived preliminary examination and was committed to the Northern District of Georgia for further proceedings. Case No. 4:17-mj-00062-BD-1 at Doc. Nos. 3 (*Minutes*) & 6 (*Commitment to Another District*). He was transported back to the CCA West Tennessee Detention Facility by CCA guards. Doc. No. 99-3 at 2 (*Tuck Declaration, ¶ 3*). On April 9, 2017, Hinkson was transported by CCA guards to a medical facility in Memphis, Tennessee, where he had a CT scan of his head. *Id.* at 30-32 (*April 9, 2017 Medical Record*). The CT exam report indicated Hinkson had no acute infarction, hemorrhage or mass lesions, but had a small right frontal meningioma.[5] *Id.*

Since 2009, when the USMS cellblock space in the Little Rock federal courthouse was constructed, thousands of prisoners have used the interview rooms. Doc. No. 99-4 at 1-2 (*Tuck Declaration, ¶3*). According to USMS records, 25,147

---

[5] According to the Mayo Clinic, "[a] meningioma is a tumor that arises from the meninges – the membranes that surround your brain and spinal cord. Although not technically a brain tumor, it is included in this category because it may compress or squeeze the adjacent brain, nerves and vessels. Meningioma is the most common type of tumor that forms in the head." Mayoclinic.org. They grow very slowly, often over many years. Risk factors include radiation treatment, female hormones, an inherited nervous system disorder, and obesity. *Id.*

prisoners were held in in the cellblock for court proceedings from January 1, 2009 to April 3, 2019, and most would have used the interview rooms to confer with counsel or the Probation Office.  *Id.*  Tuck has been assigned to the Eastern District of Arkansas since February 2007; to his knowledge, there has been no work order, plan or proposal to modify the prisoner stools in the interview rooms in Little Rock submitted by or to the USMS.  *Id.* at ¶ 4.

Tuck reviewed all USMS incident reports dating back to 2009 for the Eastern District of Arkansas.  Doc. No. 99-4 at 1-2 (*Tuck Declaration,* ¶3).  Those reports show that only two incidents similar to Hinkson's fall have occurred, one before and one after.  *Id.*  On October 18, 2016, a prisoner fell backward when he stepped back with his leg restraints in front of the stool.  Doc. No. 99-4 at 4 (*October 18, 2016 Field Report*).  According to the field report, the inmate was not injured, his head did not contact anything, and he did not complain of pain.  *Id.*  Neither Rahbany nor Gough prepared or approved the report of the incident, and neither are mentioned in the report.  *Id.*  Another prisoner fell backwards on December 14, 2017, after Hinkson's fall, when his leg shackles were caught around the base of the stool, striking his head on the wall.  Doc. No. 99-4 at 5 (*December 14, 2017 Field Report*).[6]

---

[6] Gough did not prepare the incident report and is not mentioned in the report. Doc. No. 99-4 at 5 (*December 14, 2017 Field Report*).  Rahbany had transferred out of this district when the December 14, 2017 incident occurred. Doc. No. 99-1 at 2 (*Rahbany Declaration)*.

Rahbany's declaration testimony is consistent with Tuck's testimony. According to his declaration, Rahbany served as Chief Deputy United States Marshal (CDUSM) in the Eastern District of Arkansas from December 2010 until July 22, 2017.  Doc. No. 99-1 at 1 (*Rahbany Declaration*).  Rahbany had no input or control over cellblock design or USMS prisoner leg iron policy when he became CDUSM - the cellblock and interview rooms were built to prisoner detention standards.  *Id.* at 2.  During the almost seven years Rahbany served as the CDUSM in Little Rock, thousands of prisoners were held in the cellblock in the Little Rock courthouse, and most used the interview rooms.  Only two prisoners, including Hinkson, fell.  *Id.* at 3.

While Rahbany generally assigned one DUSM to the main cellblock each day, seven to eight DUSMs would be available for general operation duty, including moving prisoners to and from the cellblock. Doc. No. 99-1 at 2. He explained that prisoner movements involve short distances and do not require supervision, but if supervision was needed, it would be provided by a first-level supervisor, not the CDUSM.  *Id.*

Rahbany reviewed the Field Reports from the April 6, 2017 incident involving Hinkson and the October 18, 2016 incident involving another prisoner.  Doc. No. 99-1 at 1.  He has no recollection of either incident or either prisoner involved.  *Id.* at 2.  Rahbany stated that his only involvement with Hinkson was to sign the April

6, 2017 field report as the approving official. *Id.* He had no involvement in the incident where a prisoner fell in 2016, and explained that there would be no reason for him to know of that incident because the prisoner was not hurt and no medical treatment was requested or provided. *Id.* at 3.

According to Gough's declaration, he worked as a DUSM in the Eastern District of Arkansas from November 24, 2014, until December 18, 2018. Doc. No. 99-2 at 1 (*Gough Declaration*). He reviewed the field reports from both the 2016 and 2017 incidents, but has no recollection of either incident and did not prepare the reports. *Id.* Gough was the DUSM assigned to the cellblock on April 6, 2017. *Id.* at 1-2. He explained that his role was not to act as a supervisor, but to keep track of who is coming into the cellblock, the detention facility they are coming from, when the prisoners will arrive, whether any of the incoming prisoners have security or medical issues, what courtroom they need to go to, and making sure the prisoners get there on time. *Id.* at 2. The DUSM assigned to the cellblock does not typically escort prisoners from the cellblock to interview rooms and courtrooms; rather, DUSMs in the area would do so. *Id.* He also explained that he was considered the USMS medic when he was assigned to the Eastern District of Arkansas and would be called for any medical issue. *Id.* It was his practice to write a report concerning any injury or medical issue he was called for and any treatment he provided. *Id.*

Because he is not mentioned in the field report describing Hinkson's fall, he believes that he was not in the courthouse when Hinkson fell. *Id.*

## V. Analysis

The Defendants argue that the *Bivens* remedy should not be extended to Hinkson's claims, but that even if such a remedy were available, they would be entitled to qualified immunity because they did not violate Hinkson's clearly established constitutional rights. Because there can be no *Bivens* remedy if there is no constitutional violation, the Court first addresses whether Hinkson's clearly established constitutional rights were violated.

Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015). Courts may exercise "their sound

discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances of the particular case at hand."

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Eighth Amendment[7] requires prison officials to protect inmates from a

substantial risk of harm to their health and safety. *Helling v. McKinney*, 509 U.S.

25, 33 (1993). To prove an Eighth Amendment violation, a plaintiff must show (1)

an "objectively, sufficiently serious" deprivation, meaning that he was incarcerated

under conditions posing a substantial risk of serious harm, and (2) that the defendant

was deliberately indifferent to the substantial risk of serious harm. *Farmer v.*

*Brennan,* 511 U.S. 825, 832 (1994); *Schoelch v. Mitchell*, 625 F.3d 1041 (8th Cir.

2010).

The evidence provided by Defendants establishes that they were not

deliberately indifferent to a substantial risk of serious harm which resulted in

---

[7] In his Amended Complaint, Hinkson argued that he was incarcerated as a pretrial detainee during the April 6, 2017 incident at the Little Rock courthouse, but was entitled to as much protection under the Fifth and Fourteenth Amendments as under the Eighth Amendment. Doc. No. 57 at 2. The Defendants correctly point out that the Eighth Amendment applied because Hinkson was not a pretrial detainee, but was a convicted prisoner since he was arrested for violating the conditions of his supervised release, which had been imposed with a 2012 conviction for illegal entry. *See United States v. Hinkson*, 744 Fed. Appx. at 659-60. *See also Flores v. Mesenbourg*, 116 F.3d 483 (9th Cir. 1997) ("We have little difficulty concluding that the Eighth Amendment provides the proper standard for Flores. He was subject to incarceration for parole violation because he had originally been convicted and given the sentence which was moderated by parole. His original conviction is the authority under which he was confined after his parole violation.").

Hinkson's fall. More than 25,000 prisoners have been held in the USMS cellblock area in the Little Rock courthouse since it was constructed in 2009. According to CDUSM Jay Tuck, most of those prisoners have used interview rooms to confer with counsel. It is also the longstanding practice of the USMS office in Little Rock to fully restrain prisoners with handcuffs in front and leg irons. Yet, only three prisoners have fallen from a stool in an interview room since 2009. It follows that the use of leg restraints and fixed stools in the interview rooms does not present a *substantial* risk of serious harm.

Further, there is no evidence that either Defendant was aware of the **one** fall that occurred before Hinkson fell. They are not named in the incident reports concerning the October 2016 fall, and they have sworn they have no knowledge of that fall. Hinkson has provided no evidence to the contrary.

Hinkson does not dispute the facts asserted by the Defendants,[8] but claims there is an issue of fact as to whether Gough or Rahbany could have been deliberately indifferent to a risk of harm simply because they were present on the day he fell. *See* Doc. No. 111 at ¶ 4. Their presence alone does not create a material issue of fact; as

---

[8] When he filed his response in May 2021, he argued that summary judgment would be premature because he had not had an adequate opportunity to conduct discovery. Specifically, he stated that he was still trying to learn and confirm the identity of the actual DUSM who escorted him to the interview room. Doc. No. 100 at 2. Hinkson did not identify any outstanding discovery that would establish liability on the part of the existing Defendants. He has now had several additional months to conduct discovery, and there is no new information concerning other potential defendants.

previously explained, there is no evidence either had reason to believe Hinkson would fall in the interview room. Additionally, there is no evidence that either Defendant personally escorted Hinkson to the interview room before he fell. As CDUSM, Rahbany was not responsible for escorting prisoners to and from the cellblock or for supervising those escorts. And while DUSM Gough was assigned to the cellblock on the day Hinkson fell, he explained that he would not normally be involved in escorting prisoners to and from the cellblock to interview rooms. Additionally, Gough believes he was not present at the time Hinkson fell because he did not sign and is not mentioned in the report documenting Hinkson's fall. As the USMS medic at the time, Gough believes he would have been called for any medical issues that occurred and involved in providing treatment for those issues had he been present when Hinkson fell.

The Defendants have established that they did not violate Hinkson's constitutional rights; accordingly, they are entitled to qualified immunity. Because no constitutional violation occurred, there can be no *Bivens* remedy. Accordingly, it is not necessary to address whether the *Bivens* remedy should be extended to the type of Eighth Amendment violation alleged in this case.

## VI. Conclusion

For the reasons stated herein, the Defendants' motion for summary judgment

(Doc. No. 98) should be granted, and this case dismissed with prejudice.

IT IS SO RECOMMENDED this 25th day of January, 2022.

_____
UNITED STATES MAGISTRATE JUDGE